Pleasant Odom, defendant in error, brought this suit against his wife, Ocia Odom, plaintiff in error, for the cancellation of a deed executed by him conveying to the said Ocia Odom 50 acres of land situated in Tyler county, two mares, a waggon, and certain household and kitchen furniture. Subsequently to the institution of the suit, Pleasant Odom was granted a divorce from the said Ocia by the district court of Tyler county, and this suit was tried on an amended petition filed after the divorce was granted.
Plaintiff, after alleging that he on the 21st day of January, 1907, was the owner of the property in controversy, further alleged: "And that defendant, being desirous of obtaining possession of said land and other property above described, fraudulently and wickedly devised a scheme by which she might obtain possession thereof, and acquire title thereto without paying plaintiff the value thereof. Plaintiff further alleges that he is, and was at the date aforesaid, old and partially blind, and by reason thereof was incapacitated from properly attending to his business; that defendant, fraudulently taking advantage of his said infirmity and incapacity, did induce plaintiff for the pretended consideration of defendant living with plaintiff as his wife, and taking care of him the rest of his lifetime, to sign a deed conveying said land and above-described property to her; that said defendant made said false and fraudulent representations and promises with the design and for the purpose of cheating and defrauding this plaintiff out of said above-described property, and knew at the time she made said representations and promises that they were false, and that she did not intend to carry out her promises; that plaintiff relied on the said representations and promises made by defendant, believing they were made by her in good faith and with the intention of living up to same; that this plaintiff was deceived by said false fraudulent representations and promises, and thereby induced to execute and deliver said deed to the above-described property; that defendant, making said false and fraudulent representations to plaintiff, as before set out, led plaintiff to believe, and he did believe, that the defendant was making said promises in good faith, and would comply with her agreements, and he relied upon said representations made by defendant, and executed said deed as aforesaid to defendant to said above-described property, believing that she would continue to be his wife and nurse and care for him during the remainder of his life; that, so soon as the said deed was signed, executed, and delivered by plaintiff to defendant, she, defendant, began to try to rid herself of plaintiff, and finally drove him from his home, and failed and refused to comply with her said agreements, which constituted the consideration. Plaintiff further alleges that defendant married this plaintiff with the full intention of defrauding him out of this land and property, and for no other purpose, and, as before alleged, sought to drive plaintiff from his home of many years so soon as she had induced plaintiff by her fraudulent representations and promises above set out to execute and deliver said deed to her. Plaintiff further alleges that in truth and in fact no consideration passed in said deed from defendant to plaintiff, and that said deed is wholly without consideration and void, but defendant intends and threatens to sell said land *Page 901 
and property before mentioned, and to use same for her own use and benefit, or to hold and occupy same, to the prejudice of this plaintiff, and to deprive him of same." Defendant answered by general demurrer, special exceptions, general denial, and plea of not guilty. The case was tried before a jury, and resulted in a verdict and judgment for plaintiff, from which the defendant has prosecuted this appeal by writ of error.
The only assignment of error which we think it is necessary to pass upon is the ninth, in which plaintiff in error complains of the refusal of the court to give her second special charge, which instructed a verdict in her favor. In passing upon this assignment we must necessarily review the testimony bearing upon the issue of fraud of defendant in procuring the deed, and, if the evidence most favorable to the plaintiff does not justify the verdict in his favor, the judgment must be reversed.
The plaintiff testified that he was 88 years of age; that he and defendant were married on Sunday, January 20, 1907, in Hardin county; that they left that day for his home in Tyler county, stopping at night with a friend, and completing their journey the next day. It was on this trip that plaintiff told defendant he intended to give her the 50 acres of land. He said: "I never thought about conveying to her the property until after we married and started home. She was going on about the children (his children by a former marriage) tearing her up, and I said they would not, and, `if you treat me right, every one I have got will treat you right.' We did not have any such agreement (to convey the land) before we were married. That was a matter that occurred to me later. After I married her, I told her what I was going to do. I told her I was going to give her this property. After we married and started home, I told her I would give her the property, and she wanted the horses. I suggested first that I give her the land, and she wanted the horses also. What made me suggest to give her the land was this: I told her, if she took care of me, I would give her 50 acres of land, and she would have a home at my death. The horses was a matter of her suggestion. It was a voluntary statement on my part about giving the tract of land to her, and that was all there was in the voluntary statement. I agreed to give her 50 acres of land at my death as a home. The horses came up later at her suggestion. They were not mentioned at first. They had nothing to do with the land. I told her I would give her a bill of sale of the horses and wagon, and done that after I carried her home, and she then wanted all the chickens and household goods, and I would give her them, too. That did not take place immediately after we were married. It was two or three days after we were married." Asked if he and defendant had any agreement as to the execution of the deed, and what was she to do about the matter, he replied: "She was to be my wife and take care of me my lifetime for that property, and that is the reason I gave it to her." Continuing, he said: "She said she would live with me all of my life. She was to live with me as my wife, and take care of me all my lifetime for the property. After I made the deed to her, it was about two months before this difference arose. She wanted me to give her all the balance of the whole estate, and the children wanted some, and I would not do it and there came up a row, and then she did everything in the world she could to separate us, and I would not do it, and did not do it until she drove me off. She ordered me out of her house and off of her land, told me to get off of it, and I left because I knew I would get a dose of strychnine if I stayed there that night. I left then, and I stayed left." He further testified: "At the time I made this deed I relied upon the representations she made that she would take care of me. I believed what she said about it. I relied upon what she said she would do and made the deed to her. If I had not believed that she was going to do it, I would not have made the deed to her at all. I believed I had a good woman, and I believed what she said she would do; but she done everything else but what she promised to do. I would not have given her the deed if I had not believed she would do what she said she would do." Asked what he would have done if she had complied with her agreement, he replied: "I would have stayed with her, and taken care of her until this day."
Dan Jordan, a justice of the peace who wrote the deed and took plaintiff's acknowledgment thereto, testified for plaintiff substantially as follows: "They were married at the time the deed was made to the best of my knowledge. It was my understanding that they had just married the day before the deed was made. I know how the deed came to be made. He came by my house, * * * passed by going up to Mr. Odom's place 1 1/2 miles above there, and he told my wife to tell me to go on up there. He left a message for me to go on up there. I went up there. * * * He had me to make the deed. I don't know anything about the terms and conditions entered into before marriage. All I know is what he said at the time the deed was made. * * * I wrote that instrument in accordance with the instructions given me by Mr. Pleasant Odom. The instrument speaks the agreement between the parties. There was some little hitch in it that I did not understand exactly. I started to write it. I think this is as near as I can repeat it. He said: `I have married me a young wife, and she is a good woman, and I want this property fixed now beyond any doubt that, whenever I die, I don't want her bothered in any way. *Page 902 
As soon as I die, I want her to have everything I have got;' and he walked off. * * * I took the acknowledgment right there, and he acknowledged it after I had written it. I read it over to him. * * * He did not raise any objection to it whatever." Witness further said that plaintiff told his wife that he wanted her to go to Woodville the next morning and have the deed recorded. "I don't want you to be bothered about this thing. I want you to sure have it. You will outlive me, and, when I die, I don't want you to be bothered over what I have got. I want you to have everything right."
In this connection the plaintiff testified: "I signed that deed there. I don't know whether Mr. Jordan read it over to me or not. I suppose he did. There were no objections to it as far as I know at the time of the execution of it. As to whether I delivered the deed to Mrs. Odom, will say I think Mr. Jordan delivered it to her. I think after he wrote it he handed it to her. I will not say for certain. I guess Mr. Jordan handed it to her for me. As to whether it was with my approval will say I don't deny the truth. As to whether I requested my wife to place it of record the next day, will say I think I said: `As long as we are doing nothing, better come here and have it recorded.' The deed was brought here and recorded. She brought it up here herself. I came with her. I heard what Mr. Jordan said at the time the deed was made about my wanting her to have the property, and I say that I did say I wanted her to have it, but she was to take care of me my lifetime for the property." He further said this agreement was made after his marriage. "We had no agreement before we married only to marry; that is all the agreement there was."
Plaintiff's witness R. H. Brown testified that he had a conversation with defendant some time in the year 1907, in which she said she did not marry Pleasant Odom for love, but for his money and property, and that she would get rid of him in some way, and that she would not live with him and serve him as a wife. Except that it was in 1907, the witness could not be more definite as to the date when this statement was made.
It was shown that at the time of the execution of the deed in question plaintiff owned 150 acres of land, of which the 50 acres in controversy is a part. The deed sought to be canceled is by its terms an absolute, unconditional conveyance of the land, without any reservations whatever, and contains covenants of general warranty. The consideration recited in the deed is "one dollar and other valuable considerations to me paid by Ocia Odom." The undisputed evidence shows that during the time plaintiff and defendant lived together the defendant denied to plaintiff the rights of a husband, and refused to submit to his embraces.
We have set out above the substance of the testimony offered upon the issue of fraud in procuring the execution of the deed, and we do not think it sufficient to raise the issue. The deed being absolute on its face, the title would not revert to defendant in error upon failure of plaintiff in error to perform the covenants which were the consideration for the conveyance. Elliott v. Elliott, 50 Tex. Civ. App. 272,109 S.W. 216; Railway v. Titterington, 84 Tex. 218, 19 S.W. 472, 31 Am.St.Rep. 39; Mayer v. Swift, 73 Tex. 367, 11 S.W. 378; Moore v. Cross,87 Tex. 561, 29 S.W. 1051; Freeman v. Jones, 43 Tex. Civ. App. 332,94 S.W. 1072; Selari v. Selari, 124 S.W. 999.
We think under the undisputed evidence in the case the plaintiff in error was entitled to a verdict, and the court should have so instructed the jury. It follows that the judgment of the court below should be reversed and judgment here rendered for plaintiff in error; and it has been so ordered.
Reversed and rendered.